To our next case, United States v. Jenkins and a few others. Mr. Beers, I want to hear from you. Thank you. May it please the Court. My name is Paul Beers. I'm from Roanoke. I represent Appellant Jenkins. Here with me is Cecilia Englert from Alexandria. She represents Appellant Brooks. I want to thank the Court for appointing me to represent this gentleman on such an important appeal. It's important because I think the government in this case is trying to push the boundaries of RICO Enterprise, that concept, beyond any other case they've cited, and I think erroneously. Mr. Brooks is the one that has the attempted murder. Yes, Your Honor, that's correct. I just want to make sure I'm on the right page. And there's another appellant who elected not to be here because the arguments are overlapping on count one, the conspiracy count, and the issue is quite narrow. It's whether or not they've proved the essential enterprise element. The parties agree on the test, and we agree this case rises and falls largely on interpretation of a 2009 Supreme Court decision called Boyle. And we agree on the racketeering issue here. I mean, there's no question the appellants were engaged in a racketeering predicate, that is, drug dealing in Franklin, Virginia. There's no question they knew each other. There's no question that some of them were related. But our point is they didn't prove that this group, this clique, these group of friends or family, constituted an enterprise. They were not a gang. In fact, we have testimony from one of the government's witnesses on page 18 and 19 of the record. It says they're not a gang. They didn't operate as a gang. They know what gangs are. There are plenty of gangs in that part of coastal Virginia. There are Bloods and there are Crips, but it's clear, there's no dispute in the record, this was not either a Blood or Crip-affiliated entity. It's not an entity at all. In fact, weren't the defendants, some of them Bloods and some of them Crips? Weren't they from different gangs? Several of them were Bloods, Your Honor, including Brandon, who they say was the leader of this so-called enterprise. He was a Blood. Got it. I don't think there were any Crips. But they were in different subsets of Bloods, some of them. Yes, yes, that's correct, Your Honor. And there's also a Crips affiliate in that town at this time called the Double O. So you had that going on, that dynamic, Crips against Bloods, we've all seen that. But this wasn't that. It's not an enterprise. Largely, I mean, the reason you know it's not an enterprise, the word enterprise itself implies they're in business together. It's an enterprise. They're not in business together. They were independent drug dealers. So if you go out to an open-air drug market in any of our cities, you'll see different people out there that know one another selling drugs, selling crack cocaine, for example. That doesn't make them an enterprise just because they know one another and they have relationships with one another. They're independent sole proprietors. And that is the most critical problem with the government's case, why the judge should have granted the Rule 29 motion. They didn't go beyond that and show any kind of identifiable structure to any extent. They showed no rules, no initiation rights. But most importantly, they showed no commingling of drug profits. They didn't share losses. They didn't share profits. They can't be an enterprise. Justice Alito tells us that in Boyle in his footnote 4. He said, of course, if you have independent venturers, they know each other, but they're operating independently, that's not an enterprise. It may or may not be a conspiracy, but a conspiracy under the Controlled Substance Act is very easy to show. The crime's complete upon agreement. We don't even need an overt act. But as the Boyle court says, and this court has said, post-Boyle, there needs to be more than a conspiracy. There has to be proof of an enterprise. So that's the most essential problem. That's Count 1. Count 4 only concerns Jenkins. Count 4 is a substantive crime under Vicar, attempted murder. It's actually under the same subsection of the statute, 1959A, 5. In that case, he was convicted of attempted Vicar murder 14 months following Brandon's death. So the conspiracy is limited to a three-day time period. I should have pointed that out at the outset. December 17, 1917, that's Count 1. It's a three-day alleged conspiracy. Again, no proof of enterprise, so they should have lost that. The judge should have granted the motion for judgment of acquittal. On Count 4, it's 14 months later in February of 2019. At that point, you have no continuity. The Supreme Court says continuity is critical to an enterprise. And you have some structural differences. First of all, they say it's all about Brandon. This is after one of the other, not a member of this group, we'll call it, but one of the other, maybe it was a crypt. He was a crypt. A video that they thought was demeaning to, was it Brandon that was killed first? Yes, Your Honor. Okay. That's the right time frame, right? The court's time frame is perfect. The killing of Brandon happened. Is that evidence that at least the 00s thought that Brandon's crew was like sort of a thing? It wasn't like a bunch of sole proprietors, right? I mean, they sort of say scoreboard zero to one, right? Or whatever that precisely the line was. I mean, that suggests that, you know, the crypts at least thought that this group, what I'll call Brandon's crew because it's just an easier way of referring to it, might have just been Brandon's group of, you know, individual actors. But they were sort of an enterprise. I mean, why isn't that? I understand you're making a different argument about this point, but why isn't that some evidence that a jury could use to sort of say, like, listen, people that were acting in this area at the time who knew, like, what was going on sort of considered that group to be a group. Like, not just a bunch of sole proprietors, but like to be a group. Like, I actually thought this was some of the, you know, more interesting evidence that, like, there was real evidence of people on the ground at the time who had real interactions. And they're purporting to say, like, this is a group we compete against and we're winning, zero to one. Tell me why I don't interpret that language or, more importantly, why a reasonable jury couldn't understand that language in that way. Thank you, Your Honor, for the question. Of course, they didn't testify. That was a crip that made the video, the taunting video, the happy birthday video. So he didn't testify. That just shows that, you know, he's taunting Edward, Brandon's brother, and Brandon's friends, hey, we killed your buddy. He's doing it in a way that shows his impression of what reality is, right? It's not, you know, maybe it's not for the truth of the matter asserted, right? But he's showing that, like, his impression, his understanding at the time is that this is a crew, right? And we're competing against them. We're the crips. They're the crew. We're the double O's or whatever it is. They're the crew. And, like, we're winning. That sort of feels like we've got a team on the other side. Well, thank you. I understand the court's concern and question, but, of course, Brandon was in a gang. He was a blood. In fact, he was the big homie of the Bloods, and the guy taunting him with his video is a crip. I totally think a jury could take that version of the facts, right? But I don't get to do that, right? I sort of have to take the facts and sort of say, could a jury, hearing that, I mean, we've got other facts here, but I'm just focusing on one because you brought it up. If I just look at a jury and say, could a jury understand that as some evidence that there was, like, an organization on the other side, even if just a loose affiliated, as compared to a group of sole proprietors, I don't know. That seems like some evidence to me. Well, a group of sole proprietors can be on good terms with one another and be friends and have rivals over here. It still doesn't make them in business together. It doesn't have them sharing the profits of this racketeering activity. The enterprise has to engage in a racketeering activity as an enterprise. Here, the only racketeering activity alleged is drug dealing. This so-called enterprise is not engaged in a racketeering activity as an enterprise. So it doesn't change that fact. But, again, count four is even weaker because, by that point, there's no more railroad. As soon as Brandon is murdered in 2017, the railroad is vacated. The railroad was the house that they say is the base of this so-called Brandon's crew enterprise. That's gone. Brandon, of course, is gone. And, in fact, everybody else disperses except Edward, his brother, and my guy Jenkins, who's still around. Is there evidence there's still drug dealing? Yes. But so what? The Supreme Court says there has to be continuity. It has to be an ongoing unit. This concludes my portion of the argument. Thank you very much. Thank you, Mr. Beers. Ms. Engler? May it please the Court. May it please the Court. I'm Cecilia Engler, and I represent the appellant J'Pree Brooks. I would like to spend my time to address Mr. Brooks' conviction for attempted murder. And my argument centers on the government's failure to prove that Mr. Brooks had the intent to kill at the time that he fired three shots into a house at 3 o'clock in the morning. As I understand the government's argument, it is that Mr. Brooks went out that night with the intent to kill this fellow, Tooth, and that he shot up Tooth's mother's house, and that this intent to kill Tooth sort of transferred to his mother. Is that what you understand the argument to be? My understanding, yes. And I think that changed a little bit. In the trial court, in closing arguments, the government actually, after the jury was instructed that the jury has to find intent and a direct act, the government argued that there was intent to kill Tooth. And I'm not sure that it was made very clear to the jury that this intent was transferred to the mother so that there was actually, at the time the shots were fired, an intent. Was the argument made that, well, maybe Tooth was at his mother's house, so he would fire shots on the chance that Tooth had stayed at his mother's house? There was not that argument. I think that there was a disconnect, that there was evidence that Mr. Brooks and others were driving around the neighborhood looking for Tooth. Do you agree that there was, that they had an intent to kill Tooth? It seems like to me there are three possible pieces here. One, you could have said there was never an intent to kill Tooth. That doesn't seem to be the argument that you are making or really could make. You could make the argument that there was no act toward the commission of that. Or I take you to be making that there's no connection between those two, right? That at the time of the shooting, it wasn't motivated by the intent. Help me understand, because it seems like to me here, unlike cases like Thacker, for example, there was absolutely evidence from which a jury could conclude an intent to kill Tooth. So this isn't somebody that they didn't know. They had an absolute intent to kill Tooth, and they took actions that at least arguably were toward the commission of murder. That was shooting into the house. The question is the connection between those two, and you've sort of argued this, right? That sort of seems to me to be like a quintessential question for the jury, right, as to whether the actions taken were connected to the intent to kill. The cases that you've relied on, like Thacker, I think don't help you, because those are cases where there never was any intent to kill anybody. Fine, we don't have that. Why couldn't a jury conclude here that I'm driving around looking to kill somebody in a particular person named Tooth? I see the house where Tooth at least at one point lived. Whether he does now or not, I don't know, and I shoot into the house. Why can't a reasonable jury in that context say that, like, that action was taken in connection with the intent to kill Tooth? I understand your argument is that, like, no, no, these bullets were fired high. All right, but, like, a jury doesn't have to believe that, I don't believe. So help me understand why a jury couldn't make this connection. I might not make it, but why couldn't a jury? So, Judge Richardson, you're correct that our position is the third of your three different scenarios, and that is that at the time Mr. Brooks fired the shots, that he had to have had the intent to kill someone, and that someone would either be, in the facts of this case, either Tooth or his mother. Now, firing shots into that house at 3 o'clock in the morning when Tooth did not live there, there's no reasonable chance that he was going to kill Tooth by firing shots into that house. Why do we know that? Why was a jury required to conclude there was no reasonable chance that Tooth was there? What should I look at in the evidence to find that? Well, there was testimony that Tooth's mother lived there alone. There's no testimony that Tooth lived there, and firing shots… That's an absence of evidence, right? But, like, you know, that doesn't preclude a jury from concluding that, like, people often visit or live or stay for periods of time with their mother. At some point, there's speculation, I suppose, but in this case, it was the government's burden to prove intent, intent to kill. They definitely proved intent to kill. They needed to prove that it related to firing a gun into somebody's house. They had intent to kill. There's no doubt about that, right? But it's just the connection, and I just wonder why the jury couldn't draw that connection. Well, I would posit an example of, let's say, Mr. Brooks is riding around looking for Tooth to kill Tooth. He sees Tooth's mother, say, in a car, and he shoots out three of the tires, and there's no reasonable chance that that's going to kill Tooth. And I'd agree with you on that. Problem is that's not what you got. I think it's analogous, though, because if we're saying that someone's actions, they intend the probable consequences of their actions, all three shots were fired high up on the house. So your argument, I take it to be that under the Virginia statute, there would have to be sufficient proof that there was a specific intent to kill Tooth's mother in order for him to be convicted. Is that the bottom line?  That is correct. That is our argument, and that the government did not put in any evidence of intent to kill Tooth's mother. All right. Thank you very much.  You and Mr. Beers both have some rebuttal time. Ms. Taylor? May it please the Court. Kristen Taylor on behalf of the United States, the appellee in this case. Why don't we start with Mr. Brooks? What's your best evidence of the specific intent under the Virginia statute? Your Honor, as this Court is aware, intent can be inferred by reasonable inferences drawn by facts or proven at this case. What the jury heard was that Brandon Leonard was killed, and it happened a couple of days after an incident at a shot house that involved Brandon Leonard and Mr. Brooks. And the two of them, I'm sorry, Mr. Leonard, Mr. Brooks, and one of the leaders of the Double O gang, the rival gang, got into it at this shot house. And during that incident, they drew guns at one another, and there were threats that were made between the two. Let me go at it a different way. What's the evidence of, I'm not saying that this is necessary, but what's the evidence of specific intent to kill Tooth's mother? Cynthia Barnes testified that she had been living at the South Street residence for approximately 18 years. E.J. Leonard testified that that was a well-known residence of Ms. Barnes and that everybody in the crew was aware of who resided there. In addition to that, Ms. Barnes did, in fact, testify. I know counsel stated there wasn't evidence, but E.J. Leonard testified, or I'm sorry, Cynthia Barnes testified that her sons had stayed with her frequently. And so there was a reasonable likelihood, after they had gone around the neighborhood looking for Tooth, that he could be staying there with his mother. So do I take that argument to mean your point is that the intent to kill Tooth is what is at issue? You're not alleging or you're not arguing, at least now, that there was a specific intent to kill Tooth's mama, but instead there was an intent to kill Tooth. And they shot into the house with the at least plausible belief that Tooth might be in there and that that would be enough. That is enough, absolutely. In the same way that if I had a specific intent to kill Judge Agee and I went and put a bomb under his house and blew it up, the fact that he happened to not be there wouldn't actually defeat an attempted murder charge. Absolutely. And in this case, I think one of the most important pieces of evidence that gets kind of lost in the record is that witnesses testified that Mr. Brooks was in possession of two different weapons that night. He was in possession of a handgun, a .45 caliber, and he was also in possession of a rifle. So when driving past on the second pass after they had gone out and looked for Tooth and now left this other gang member's house, going out for a second round, driving by Ms. Barnes' house, he elected not to use the .45 caliber, but he elected to use the rifle that had higher capacity, more likelihood of striking, more lethal force. And he chose to shoot not just one shot up into the air, but he used a rifle and shot at least three to four rounds into the front of that house. So what's your best Virginia case under the attempted murder statute where the defendant is not shown to have specific knowledge of the occupants of the residence? I think... Because I haven't found one. I don't... So I think it would be the cases, and there are a few cases where the defendants have not had... And I think the Virginia law, at least the government's perspective, that specific intent needs to be specific intent to kill a person. That there doesn't have to necessarily be a specific intent to kill a particular individual inside of that house. So for example, there are Virginia cases cited in the government's brief or in the party's briefs where the defendant has committed an act of violence, for example, setting fire to a building. Not necessarily knowing who's inside that residence. Is that Hancock that you're talking about? It's not Hancock, Your Honor. I'm sorry. The name is... It might be Commonwealth v. Har... Well, here's kind of a bottom line question. I'm having trouble differentiating what you're arguing in this case for attempted murder. How that doesn't basically convert every prosecution under a separate Virginia statute for shooting into an occupied building into an attempted murder case. I think there has to be a reasonable understanding, a reasonable belief that there is a person present inside of that home at that time. And I think that's sufficient. In those cases, for example... Well, what's your case that there may be one that says a person. But I thought that the cases said there had to be a specific intent to kill the person in the dwelling. And that that's what separates the attempted murder statute from the shooting into the occupied dwelling statute. I think that's absolutely correct. I think Your Honor puts it perfectly. And we do have that in this case. First of all, regarding Ms. Barnes, given the time of... But to get there, the jury has to have concluded that because Brooks stayed there at some point in the last 18 years, that there was a reasonable chance that he would be there that night and that they could murder him by shooting into the building. And it seems like to me that has to be your argument. That's correct. And I think that the facts in this case support that inference for the jury. There was enough evidence for the jury to conclude that. Given that Ms. Barnes testified that her son stayed with her at times, that she had lived there for a long time. It was the middle of the night. They had cased the neighborhood looking for Mr. Barnes. They were not able to find him. And on that second round, I think that the evidence suggests that they were driving past that house with the expectation that that could be the location where Mr. Barnes was. And when he shot the bullets into that house, that that was his expectation. So if we were to assume simply for purposes of argument that we disagreed with you on the attempted murder conviction, would you also agree that the related firearm conviction as to Mr. Brooks would have to be reversed? Well, that is correct because the attempted murder in Native racketeering is the factual predicate for the 924C. All right. Can I ask you a question about the enterprise issue? In your brief, you lay out in pretty specific detail the features of the low lives that support a finding of an enterprise with respect to that group. Initiation rituals, hand signs, territory, shared criminal activity. But those features are largely absent from this group that you call Brandon's crew. They themselves didn't call themselves that, right? That was a sort of title made up by the government in the case. So how should we consider the lack of these structural elements, particularly given that all the cases that you rely on contain similar evidence to the markers of enterprise present in the low lives group? The main feature of this enterprise, and I think I'll start with its purpose, and it stems from the low lives. I think it's fair, and I think the jury was free to infer that this enterprise was a continuation of what used to be the low lives gang. That was the relevance of introducing the evidence of the low lives and how they operated in Franklin. So the fact that some of the people in this group that you call Brandon's crew used to be in another group that could possibly be considered an enterprise, that means that anybody, it's sort of like guilt by association, I'm involved with those folks? Oh, no. Because it's not a perfect, it's sort of a Venn diagram. Some of the people were in the low lives, some of the people weren't, and then there's this group in the middle that you're calling Brandon's crew. But not all of them were in low lives. That's correct. No, the understanding of the low lives is just to help understand the relationships between the individuals who are in this new group. They're buddies, right? They hang out at the same place. They're sort of like friends. Well, they are friends, but being friends doesn't preclude them from being members of an enterprise. In this case. Nor does it require them to be considered members of an enterprise. Being friends, that's not enough, right? That's true. But what this court has recognized in the past is that to differentiate a conspiracy, a mere conspiracy from an enterprise, there needs to be some structure, but there need not be much. And in this case, there is that bit of structure that is necessary for an enterprise to exist. The purpose of this enterprise, the reason that this enterprise existed was to maintain and protect territory. That was the main purpose, and that was evident in how it related to the rival gang in that town. There was the 00 group that had an affiliation with the Crips, and there was this crew here that had an affiliation with the Bloods. The low lives, the evidence that came in about the low lives was that Brandon Leonard had a reputation. He had built up a reputation for being ruthless and for being violent. And that the low lives marked and tagged their territory, and that they used it to commit acts of violence. This particular enterprise moved in after Brandon Leonard came back from prison. He came with new Blood associates. He came back to Franklin, and he retook over that territory. And his associates came into town, and they benefited from his controlling that territory. The currency... So it's enough to find an enterprise to have individuals, assuming that we agree with you that the purpose was to maintain territory. It's enough to simply benefit from one individual's control of territory to be considered part of an enterprise for purposes of the statute? It is, because like I said, the currency in this case was that this territory was theirs. And they could use it to do with it what they wanted. In this case, many of them engaged in drug trafficking activity. And they did it with limited interference from the ops, or the 00 gang, the crip-affiliated gang. They went to railroad. They operated mostly out of railroad before these shootings took place. The buyers came in and out. We heard testimony that this was a safe place. They were protected in that area, and they didn't have to worry about the outside interference. Is there any case that you can point to that finds a criminal enterprise where, in fact, such as these, where one member of the alleged group allegedly controls territory? The others allegedly sell drugs in that territory but don't share any funds, don't share drugs, don't share a list of clients? The only thing that they share is the purpose, or they don't even have a shared purpose to maintain territory. But I think you've alleged that one person in the group has control over this territory. That's not necessarily what the government is saying here. The government says that these individuals, this crew of Brandon's, maintains this territory collectively. That Brandon's reputation for violence assists in that. It facilitates that. But that this group collectively maintains the territory. And how do they do that? They act immediately. They mobilize immediately in response to acts of disrespect and in response to the ops getting, quote, out of hand. So, for example, and we see this in this case, we see these individuals in response to 00 committing the ultimate act of disrespect and killing their leader in immediate mobilization, a determination of who they believed were responsible, arming themselves, and acting immediately. Didn't all that happen after Brandon had been killed? That is true, yes. And so how did Brandon continue to maintain control over the territory after he was no longer alive? Once again, I think these individuals maintain the territory collectively. Brandon, as the leader, helped establish that when he came back to Franklin from prison. He came there as having been a high-ranking low-life member. He was a high-ranking Bloods member. His power and influence helped them to maintain control over that territory. But they collectively maintained it. And in order to do that, they needed to act violently. They needed to respond to acts of disrespect with violence. So what was their enterprise? Under the statute, you need an enterprise. What was the enterprise? Absolutely. So in terms of relationships, we've shown that these individuals were related based on the neighborhood. This is, at its core, a neighborhood street gang. And there are two groups in Franklin. There's Brandon's crew and there's the double-O crew. And that's, again, evidenced by what Judge Richardson was talking about earlier with the scoreboard. There's a scoreboard here. There's two teams in Franklin, the double-O team and Brandon's crew. And these individuals who are in Brandon's crew, their relationships are defined on their past connections through the low-lives and their present connections with the Bloods. Right, but Jenkins, Newsom, and Brooks were never in the low-lives, right? That is correct. I want to point out to you the language from the statute that says an enterprise includes any partnership, corporation, association, or other legal entity which is engaged in or the activities of which affect interstate or foreign commerce. How does what you say is the purpose of maintaining territory in a neighborhood affect interstate or foreign commerce? Well, interstate and foreign commerce is affected by their drug trafficking activities. We heard evidence that J'Pree Brooks connected the group to a drug dealer who worked out of North Carolina and that members of the enterprise, including Mr. Brooks, including E.J. Leonard, including Monte Newsom, who was also another member of this enterprise, including Mr. Jenkins, traveled frequently to go to North Carolina to retrieve drugs from this individual, that this individual came to the railroad house to provide drugs. So the drug trafficking trade as well as the movement from Franklin to North Carolina I think sufficiently satisfies interstate commerce. So you're relying on the drug trafficking then as the enterprise, not the maintenance of the neighborhood as the enterprise? No, no. I'm just trying to get to the bottom of what's the enterprise. Absolutely. No, I understand. No, we're relying on the drug trafficking to satisfy the interstate commerce piece of that. This is an enterprise that's associated in fact, which is allowable by the statute. And Boyle helps us understand how an enterprise associated in fact is defined and what is necessary for that. And that's relationships, a purpose, and longevity sufficient to maintain that purpose. I've discussed at some length the relationships between these individuals. They are friends. They are blood associates. Again, they're cross-set associates, which shows that this isn't just a bloods organization at its core because they're members of different blood sets. And so they're obviously connected through something else. And we submit that it's through the neighborhood connection. They want to maintain control of this area. And that goes to the purpose. The purpose of this association is to control this territory. This is the territory that they want to maintain. And how do they do it? They do it through mobilization and acts of violence in response to any acts of disrespect or any movement into their territory. Before Brandon died, if I'm remembering correctly, he basically charged a commission if anybody else wanted to sell drugs in that area. That's true. There was testimony that in order for any of the ops or the 00 to sell drugs in their territory, they had to pay him tithes. Which again, just exercise, it wasn't- After he died. That's correct. That's correct. After he died, did that practice continue? No, the testimony didn't establish that or say that that didn't happen. But I think at that point, what EJ testified to was that even after Brandon died, this crew continued to sell drugs. They continued to act in the manner in which they were prior to Brandon's death. And again, what we see- But didn't all of the charged crimes take place after he was no longer alive? Yes. And there were no longer any tithes after he was no longer alive? That's what we're led to conclude, and I think that's what the jury- Well, there were no facts presented to the jury to suggest that there were tithes after he had been killed. That is true. So how does this not squarely fall within Justice Scalia's footnote four in Boyle? He describes that it's easy to envision situations in which individuals engaged- I mean, this sounds to me exactly like his description where he says there's no enterprise. I think that the way that this Court should look at it is differentiating this case from, I think, what the Court was describing in that case was more akin to Pinson. Four very independent ventures happening where there were independent- You can find that conspiracies existed, but four very independent ventures, one individual kind of tying it all together, and those individuals really not knowing about what the others were doing, didn't really understand each other's motives or reasons for doing what they were doing. I think that's what the Court was describing in that footnote. Solely independent ventures where these individuals had no collective effort whatsoever. That is not what we have here. We have a group of individuals who are tied together in various ways, who are connected to this neighborhood, who are working to maintain and protect their territory from another group that is operating in that area who wants to come in and who clearly taunts this group and reminds them when they're down one via the evidence of the scoreboard. I think that it makes sense that cases like Pinson don't qualify for an enterprise, but in this particular instance where you have the boil factor satisfied, where you have the stated purpose, the clear purpose, and again we see them acting to satisfy that purpose over and over again, even into February of 2019. What happened? We had the happy birthday video. We had the scoreboard posted. We had sharing that information. We saw that same mobilization in February of 2019 that we saw back in December of 2017. They got together. They armed themselves. They planned. They figured out who was responsible. They figured out where they were, and they carried out that attack. That ability to mobilize is evidence of a functioning unit, a continuous functioning unit. That is a unit. That's not just a group of friends. That is a group of people who have the ability to come together, mobilize, and commit acts of violence to further that stated purpose, to further the purpose of maintaining and protecting that territory from the others thinking that they can come in and get in the way. All right. Let me ask you one last question about a different defendant, Newsom, who has a conviction for witness tampering. Yes. What's our standard of review for that? For sufficiency. I'm particularly asking, do we review that claim for plain error only? Well, so I think there are two claims from Mr. Newsom. Anything related to the sentencing issue, yes. Right. This is just for the conviction for witness tampering, not the sentencing. You're right, Your Honor. I'm asking. I mean, is it the government's position it's plain error? Plain error would apply because it wasn't raised at the Rule 29, and that's because the evidence in that case was extraordinarily clear that Mr. Newsom had, in fact, engaged in witness tampering. All right. Thank you very much. Thank you. Mr. Bierce. Yes, Your Honor. Do you or Ms. Engler represent Newsom? No. A lawyer named Mark Diamond does, Your Honor. Okay. All right. Just a couple of points. The big picture here is the government has not cited the court anywhere a case like this where there's absolutely no evidence. It's not a blood organization. It's not a Crips organization. It's a bunch of independent drug dealers and succeeded in establishing that's an enterprise by itself. They're just not citing any cases. All their cases are obviously facially distinguishable. How do you respond to this argument about the purpose of the enterprise being to protect a particular territory so everybody can deal drugs independently but freely within that protected territory? I mean, they're armed drug dealers. They protect themselves, but there's no evidence they were out. They act as an enterprise in a coordinated fashion to protect a particular area. Now, Brandon did by tithing. But why don't we look at, like, what happens when Brandon's killed as sort of evidence of, like, what existed before he was killed? Okay. And a jury might well say, right? I mean, sometimes in insurance cases we say we can't look at facts after the fact to determine whether negligence occurred, but we don't think about that here, right? And so the fact that we have this coordinated response as a result of violence, doesn't that give us some evidence that they're not just looking out for themselves? I mean, you're just saying, oh, they're only looking out for themselves. That's not true. And maybe you want to say, oh, well, they did that just because they were friends? Maybe, right? But why couldn't a jury conclude that that also is evidence, right? We really defer to juries, right? And you might have very good arguments that might convince me had I been on a jury. Yes, Your Honor. But what I'm looking at is, like, couldn't a jury look at the response and say that's actually evidence that supports that they collectively protected this area as a group and that they would respond to incursions as a group? Thank you for the question, Your Honor. Because people retaliate all the time against one another doesn't mean they're in an enterprise. If someone kills another one's friend or brother in this case, there's reprisal. That doesn't mean there's an enterprise. What's undisputed is that. But that's just to say, like, you think that evidence isn't very good?  But, like, but it is evidence, right? Like, as soon as we start saying there's some evidence from which a jury could conclude, you have a response to it. I get it, right? Like, but that's not. We tend to do these types of, like, reversals, basically grant acquittals in scenarios where there's, like, no evidence to support some element. There's undisputed evidence, Your Honor. They were independent venturers. I think they've just conceded that. They were sole proprietors. These are drug dealers. I'm sorry. What do you think conceded that? You might be right, but I don't think there's any world that suggests that they just conceded that they were independent venturers. They don't need to concede it because the evidence is clear. They were not. Brandon didn't front them drugs. They all individually went to their own source and many times the same source, but they're not in business together, so it can't be an enterprise. That's footnote four, and that's also Pinson. And after Brandon died, no one replaced Brandon. If it's a structure, there would be a replacement. No one became the new Brandon. The tithing stopped. People dispersed. They left town, and by 2019, there's two of them left, Edward and Jenkins. Yes, Your Honor. At trial before the jury, was there an argument or evidence presented that the project or the enterprise itself and the purpose of it was to maintain territory? Was that presented to the jury, that theory? Your Honor, I see my time is up. May I answer this court's question?  Thank you. I don't think it was presented to the jury, Your Honor. Neither Ms. Englert nor I were there. We were appointed on appeal, but I don't think that was presented to the jury. I think they just said basically, as the court asked at the beginning, there was a lot of evidence about the low lives, which is largely irrelevant because the low lives, undisputed, were done over by the time Brandon came back from prison. There's no more low lives. Thank you, Your Honor. Thank you very much. Ms. Englert? Just a couple of points that I would like to hit on. First of all, I believe the government was arguing that Tooth may have stayed frequently at his mother's house. I did not see that in the record. I believe Ms. Barnes testified. She was asked if her sons had ever stayed with her, and she simply responded yes. Mr. Brooks, when he fired into that house, he was looking for Tooth. He may have been frustrated that he couldn't find Tooth. He may have shot as a warning. But at the time he made those shots, he did not have the intent to kill Tooth because he did not think he was going to be able to kill Tooth by doing this. He shot high up on the house, and he stopped. He could have seen where the bullets hit. He could have shot lower. He didn't. He moved on. And the other reason we know that he wasn't thinking he would be able to kill Tooth, there was Edward who was in the car in front of him. Edward testified that if he had seen Tooth that day, he would have shot him. He made no move in the house. He didn't shoot his gun into the house. The intent to kill is the essential element that separates this from Virginia's offense of shooting into an occupied building. In this case, to convict Mr. Brooks of attempted murder, the government had to prove that he intended to kill someone when he fired into the house. The government failed to make this showing, and therefore Mr. Brooks' conviction for attempted murder and his related 924c gun charge should be reversed. All right. Thank you very much. I appreciate that. The court notes that Mr. Beers and Ms. Englert are court-appointed, and we want to express our deep appreciation to you for undertaking that task because we couldn't function without it, and we're particularly appreciative of your continuing in this appellate advocacy when the government's a little short on funds. So hopefully you're going to get paid. All right. We're going to come down and greet counsel and move on to our last case.
judges: G. Steven Agee, Julius N. Richardson, Nicole G. Berner